IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| STEVEN JEWELL | AL. | |
|---|---|---|
| | : | |
| v. | : | CIVIL |
| | ACTION  : | |
| RIDLEY TOWNSHIP ET | : | NO. 09-4947 : |

<u>**MEMORANDUM**</u>

**SURRICK, J.**                                              <u>**NOVEMBER   10 , 2011**</u>

Presently before the Court is Defendants Ridley Township, Police Officer Michael A.

Bongiorno and Police Officer Gerald Scanlan's Motion for Summary Judgment.  (Defs.' Mot.

Summ. J., ECF No. 65.)  For the following reasons, the Motion is granted.

**I.       BACKGROUND**

   **A.       Factual Background**

Plaintiff Steven Jewell filed this lawsuit to recover for permanent injuries that he

sustained as a result of an automobile accident that took place on the evening of April 29, 2009

in Ridley Township, Delaware County, Pennsylvania.  (Am. Compl. ¶ 21, ECF No. 38.)  Plaintiff

was a passenger in a car that collided with another car driven by Robert M. Smith, Jr.  (*Id.* at  ¶¶

43-44.)  Smith, whose license had been suspended, was driving under the influence of alcohol,

and was being pursued by two Ridley Township police officers, Defendants Gerald Scanlan and

Michael Bongiorno, after he refused to stop his car for the officers.  (Smith Dep. Ex. 2.)  Smith

had a blood alcohol level of .228, well above the legal limit.  (Am. Compl. ¶ 22.)[1]  Smith was

---

[1]

        The Pennsylvania Vehicle Code provides that minors, such as Smith, who are less than
21 years of age, "may not drive . . . a vehicle after imbibing a sufficient amount of alcohol such
that the alcohol concentration in the minor's blood or breath is 0.02% or higher."  75 Pa. Con.
Stat. §§ 3801, 3802(e).

later charged with and entered pleas of guilty to driving under the influence, aggravated assault by vehicle while driving under the influence, fleeing or attempting to elude a police officer, failure to stop at a red signal, driving without lights to avoid identification or arrest, and reckless driving.  (Am. Compl. ¶ 46.)  He is presently serving a prison sentence of not less than three years and eight months nor more than fourteen and a half years.  (Smith Dep. 11:4-11 & Ex. 3; Defs.' Mem. Ex. I, ECF No. 65.)

That evening at around 10:45 p.m., the Ridley Township Police Department received a tip from Smith's neighbor that Smith had thrown a beer bottle into his neighbor's yard, appeared to be "highly intoxicated," and had left his home driving a light blue-colored Hyundai Santa Fe.  (Am. Compl. ¶ 27; Bongiorno Dep. 82:12-21, 90:5-14; Scanlan Dep. 32:16-33:16; Smith Dep. Ex. 2.)  Bongiorno and Scanlan drove in separate vehicles to the street where Smith lived to investigate the tip.  (Bongiorno Dep. 82:7-21; Scanlan Dep. 34:8-20, 38:21-39:5.)  The officers knew Smith and were aware of the fact that Smith's driving privileges had been suspended. (Am. Compl. ¶ 24; Bongiorno Dep. 91:10-23; Scanlan Dep. 13:21-24, 32:1-12.)  Bongiorno was the Corporal in charge of the streets that evening because Sergeant Crooks had the evening off. (Howley Dep. 30:14-19.)  After confirming that Smith was not home, Scanlan and Bongiorno parked their vehicles next to each other at the bottom of Smith's street, Ridley Avenue, when they saw a car turn onto Ridley Avenue with only the parking lights turned on.  (Bongiorno Dep. 93:19-94:1; Scanlan Dep. 38:21-39:5, 42:3-12.)  When the car approached the two officers, the driver turned off the parking lights and proceeded past the officers.  (Bongiorno Dep. 97:7-21, 100:18-102:8; Scanlan Dep. 42:3-22.)  At that moment, Bongiorno recognized that the driver of the vehicle was Smith and that he was driving a light blue-colored Hyundai Santa Fe.

(Bongiorno Dep. 70:20-71:8, 98:6-11.)

Bongiorno activated the emergency lights on his vehicle and followed behind Smith in an attempt to pull him over.[2]  (Bongiorno Dep. 98:12-21; Scanlan Dep. 44:9-14; Smith Dep. 65:19 25.)  Scanlan followed behind Bongiorno.  (Scanlan Dep. 46:5-8.)  Smith testified that when he saw the emergency lights, he was aware that a police officer was trying to pull him over, and proceeded to drive faster.  (Smith Dep. 66:3-7.)  Bongiorno called the Delaware County radio room and reported their location and that Smith would not stop his vehicle.  (Bongiorno Dep. 122:1-23, 125:13-126:8; Scanlan Dep. 45:17-22.)

Bongiorno continued to pursue Smith, with Scanlan traveling behind Bongiorno. (Bongiorno Dep. 99:3-6, 100:12-17.)  During the pursuit, Smith's vehicle was swerving from side to side.  (Id. at 112:7-14.)  The entire pursuit covered approximately one and one-half miles. (Pl.'s Mem. Ex. D at 6, ECF No. 6.)  It included 21 intersections, six turns, 13 stop signs and one traffic signal.  (Id.)  Smith did not stop at the stop signs.  (Bongiorno Dep. 103:9-16, 104:10

---

[2]     The record reflects some inconsistency regarding Bongiorno's initial activation of his emergency siren.  Bongiorno testified that after Smith had passed in front of him, he "immediately" activated his emergency siren to the "wail" setting.  (Bongiorno Dep. 98:15-21, 99:15-100:5.)  Scanlan testified that he thought Bongiorno initially was "hitting the siren like random."  (Scanlan Dep. 45:3-11.)  Smith testified that when the pursuit commenced, he did not remember the officers activating the emergency siren, but rather only the emergency lights. (Smith Dep. 62:23-66:1-2.)  Plaintiff argues that this inconsistency presents a dispute as to a material fact precluding summary judgment.  We disagree.  Smith further testified that he did not remember anything that occurred between the time when the pursuit commenced and the next morning when he woke up in the hospital.  (Smith Dep. 64:13-65:5, 66:12-17, 68:16-19, 72:25-73:16.)  There is a dispute as to whether Bongiorno activated his sirens initially upon commencing the pursuit, and if he did, at what setting the siren was activated.  There is no dispute that during the course of the pursuit, Bongiorno was utilizing his emergency siren. (Bongiorno Dep. 107:1-4; Scanlan Dep. 46:21-47:4.)  Plaintiff's reliance on the testimony of Officer Kline in arguing that there is a dispute as to whether Bongiorno's emergency sirens were activated during the course of the pursuit is misplaced.  Although Officer Kline testified that he did not hear the sirens when he was stopped at the intersection of Morton and Swarthmore Avenues, he also testified that he had left that intersection prior to when the collision actually occurred.  (Kline Dep. 13:26-14:14, 17:15-23.)

105:19, 108:6-13, 109:14-22.)  Bongiorno and Scanlan also did not stop at the stop signs.
(Scanlan Dep. 50:21-51:4.)  During the pursuit, Bongiorno had his emergency lights and siren
activated.  (*Id.* at 46:20-47:4, 52:6-19; Bongiorno Dep. 107:1-3.)  Until Smith reached the
intersection where the collision occurred, he was traveling at speeds ranging from approximately
15-20 mph to 30-35 mph.  (Bongiorno Dep. 100:12-17,102:1-8, 105:2-11, 106:21-24.)  Contrary
to Plaintiff's contention, there is no evidence in the record indicating that the police officers were
exceeding the maximum speed limit.  The roads taken during the pursuit were predominantly
residential.  (Bongiorno Dep. 103:17-20, 106:14-16.)  There were no other cars or pedestrians on

the road during the course of the pursuit.  (Pl.'s Mem. Ex. G at 3 & Ex. H at 8.)  The weather was

clear and the roadway was dry.  (Pl.'s Mem. Ex. D at 1.)  Bongiorno testified that he did not

believe that he was increasing the risk of harm to others during the pursuit.  (Bongiorno Dep.

117:11-18.)  Bongiorno further testified that the reason he was trying to stop Smith was because

he had a "reasonable suspicion that [Smith] was drunk driving," and because he was a

"suspended operator."  (*Id.* at 116:6-20.)[3]  Smith testified that he had no recollection of the
events in between the time when the pursuit commenced and the next morning when he woke up
in the hospital, and that he had "lost consciousness" during this time.  (Smith Dep. 64:13-65:5,
66:12-17, 68:16-19, 72:25-73:16.)

        While Smith, Bongiorno and Scanlan were driving west on Swarthmore Avenue,

---

[3]

        The only evidence related to the speed of the vehicles is the testimony of Bongiorno,
who stated that during the course of the pursuit, they were traveling at speeds ranging from 15-20
mph to 30-35 mph.  (Bongiorno Dep. 100:12-17, 105:2-11, 106:21-24.)  There is no evidence in
the record indicating what the actual speed limits are for the roads traveled during the pursuit.
The only evidence of speeding in the record relates to Smith, who drove into the intersection of
Morton and Swarthmore at a speed of approximately 42-46 mph, from Swarthmore Avenue,
which has a speed limit of 25 mph.  (Pl.'s Mem. Ex. D at 1, 6.)

        Moreover, the Pennsylvania Vehicle Code sets maximum speed limits for residential and
urban roads and freeways.  *See* 75 Pa. Cons. Stat. § 3362(a).  The statute provides that the
maximum speed limit for urban districts is 35 mph and the maximum speed limit for residential
districts is 25 mph.  *Id.* at §§ 3362(a)(1), (1.2).  Bongiorno testified that the roads traveled during
the pursuit were mostly residential, with the exception of Swarthmore Avenue, which was "more
of a major road."  (Bongiorno Dep. 103:17-22, 106:14-16, 110:1-3.)

        A pursuit at speeds ranging from 15-20 mph to 30-35 mph cannot be characterized as a
high speed chase, and clearly does not rise to the level of creating an unreasonable risk of harm,
particularly in light of the facts that no other pedestrians or vehicles were on the road at the time,
no adverse weather conditions were reported and the roadway was dry.  (Pl.'s Mem. Ex. D at 1.)

approximately 75 yards from the intersection of Swarthmore and Morton Avenues, Bongiorno

noticed that Smith began to speed up.  (Bongiorno Dep. 112:21-113:14; Scanlan Dep. 57:12-20

(explaining that Smith "kind of gunned it").)  Smith proceeded into the intersection of Morton

and Swarthmore and collided with a vehicle driven by Luigi DiSpigno, who was traveling north

on Morton Ave.  (DiSpigno Dep. 16:18-18:3, 19:14-20:7.)  When Smith entered the intersection,

his traffic light was red.  (Bongiorno Dep. 114:4-12.)  Schorr calculated that Smith entered the

intersection at an approximate speed of 42 to 46 mph.  (Pl.'s Mem. Ex. D at 6.)  Plaintiff was a

passenger in DiSpigno's vehicle, and as a result of the accident, suffered permanent injuries

including multiple fractures, spinal cord injuries and paralysis.  (Am. Compl. ¶ 44.)

Article VIII, Section 17, of the Ridley Township Police Department Policy & Procedure

Manual (the "Manual") sets forth Ridley Township's policy with respect to police pursuits (the

"Ridley Pursuit Policy"), and provides:

**SECTION 17:  PURSUITS**

a.  Notify Police radio immediately when initiating a pursuit.  (State the reason)


b. When notifying radio, state "EmergencyPursuit." When acknowledged byradio,
continue as follows:
    1.  Pursuit of the vehicle.
    2.  Route taken by fleeing vehicle.
    3.  Description of vehicle and occupants.
    4.  Pursuing Police vehicle shall give radio its location periodically to
    assist other units in the apprehension.

c. Onlythe Police vehicle initiating the pursuit mayuse siren when in visible
pursuit of the fleeing vehicle.

d. If the Police vehicle in pursuit has lost visible contact with the fleeing vehicle, the
operator shall notifyradio of the last known location and direction of travel.  Police
vehicle shall discontinue the use of siren and reduce speed.

e.  If another Police vehicle resumes visible contact with fleeing vehicle, operator shall notify radio and may take up pursuit using lights and siren.

f. All pursuits shall be terminated when the violation leadingto the pursuit is of such a  minor nature as to make a high risk of a pursuit unreasonable.

g. The Commanding Officer on shift will evaluate and may terminate a pursuit at their discretion.

h.  Police vehicles are not to be used as ROAD BLOCKS.

(Defs.' Mem. Ex. M. at 58.)  Ridley has had a pursuit policy in place for at least 25 years.

(Howley Dep. 41:3-9.)  The policy was updated in 2006 along with the rest of the Manual, and

was in effect on the night of April 29, 2009.  (*Id.* at 40:10-18.)  Every officer in the Ridley

Township Police Department received a copy of the updated Manual.  (Bongiorno Dep. 34:1-20.)

Before the updated Manual took effect, Captain Charles Howley, who authored the updated

Manual, presented it to the attorneys for the Delaware County Fraternal Order of Police for their

review.  (Howley Dep. 31:14-32:4.)

All officers applying to the Ridley Township Police Department must first complete the

state-mandated Act 120 police training, which includes topics addressing police pursuits and pursuit driving.  (*Id.* at 69:15-70:17; Pl.'s Mem. Ex. H at 10.)  Bongiorno has been a police officer with Ridley Township for almost 20 years, and has been ranked Corporal since August 2005.  (Bongiorno Dep. 6:17-24, 36:18-22.)  In the early 1990s, Bongiorno underwent 480 hours of police training, including training related to police pursuits and the operation of police vehicles.  (*Id.* at 24:1-25:19.)  Bongiorno does not recall the specifics of that training and no longer possesses the written course materials.  (*Id.* at 27:8-23.)  In November 2007, when Bongiorno became a training officer, he studied materials relating to police pursuits.  (*Id.* at 39:15-21-42:19, 44:11-21.)  This training was a "refresher" regarding the circumstances on which officers should or should not continue to pursue a vehicle.  (*Id.* at 44:11-21.)  Bongiorno understood those circumstances to be that officers may attempt to stop vehicles "as long as it is not a danger to the other people on the street."  (*Id.* at 44:22-45:19.)  Bongiorno further understands that when he is in charge, if a pursuit sounds like it is "becoming extreme," he will tell officers to stop pursuing the vehicle.  (*Id.* at 52:3-53:1.)
     Scanlan has been a police officer with Ridley Township since 2003.  (Scanlan Dep. 6:17.)

Scanlan received training on police pursuits at both the Delaware County Community College

6

and the Police Academy in Camden, New Jersey.  (*Id.* at 11:5-12; 21:3-18.)  He completed his

Act 120 training at the Delaware County Community College.  (*Id.* at 10:6-11:13.)  Scanlan does

not recall the specifics of that training, and he did not keep a copy of the course materials.  (*Id.* at

11:14-24, 12:12-17.)  When Scanlan became an officer at Ridley Township, he learned about

Ridley's Pursuit Policy both verbally and by review of the Ridley Manual.  (*Id.* at 26:21-27:18.)

He did not receive specific training from Ridley Township about how to drive a vehicle during a

pursuit.  (*Id.* at 29:18-21.)

It appears undisputed that prior to the night of this accident, Ridley Township had never

commenced or was the "lead car" in a police pursuit.  (Howley Dep. 97:24-98:15.)

Ridley Township does occasionally assist bordering townships or municipalities in their pursuits.

(*Id.* at 82:9-18.)  Bongiorno does not recall any other time other than the night of this accident

when he was involved in an attempt to stop a car and an accident occurred.  (Bongiorno Dep.

140:22 141:4.)  From the time he became Corporal, up and until the time of his deposition in

February 2011, Bongiorno is not aware of any accidents occurring when a police officer he

supervised attempted to stop a vehicle.  (*Id.* at 143:17-144:9.)  From the time Scanlan began as

an officer for Ridley Township up until the date of the accident on April 29, 2009, he too had

never been involved in an attempted stop of a vehicle that resulted in an accident.  (Scanlan Dep.

31:10-15.)

## B.    Procedural History

On October 28, 2009, Plaintiff filed a Complaint containing seven counts against Ridley

Township, Robert Smith Jr., Robert Smith Sr., Luigi DiSpigno, Joseph Cerrone, and John Doe

Defendants 1-10 in connection with the accident on the night of April 29, 2009.  (Compl., ECF

No. 1.)[4]  Ridley Township filed a motion for partial dismissal of the Complaint under Federal
Rule of Civil Procedure 12(b)(6), arguing that Plaintiff failed to state a viable due process claim
against Ridley Township and that this Court should decline to exercise supplemental jurisdiction
over the state law negligence claims against Ridley Township and John Doe Defendants 1-10.
(ECF No. 4.)  The motion was denied by Order dated October 19, 2010.  (Order, ECF No. 34.)
Plaintiff thereafter filed an Amended Complaint in which he identified two of the John Doe
officers as Gerald Scanlan and Michael Bongiorno.  (Am. Compl. ¶¶ 7-10.)  In his Amended
Complaint, Plaintiff asserts two claims against Ridley Township: 1) vicarious liability for the
alleged negligence of its police officers on April 29, 2009 (Count VI); and 2) violation of
Plaintiff's due process rights pursuant to 42 U.S.C. § 1983 (Count VII).  (*Id.* at ¶¶ 81-91.)  Count
VI also asserts a claim against Bongiorno and Scanlan for alleged negligence in connection with
the police pursuit on April 29, 2009.  (*Id.* at ¶¶ 81-88.)[5]

On July 26, 2011, Defendants filed the instant motion for summary judgment.  On

November 9, 2011 we entered an order granting Defendant's Motion.  (ECF No. 85.)

This Memorandum accompanies that Order.

## II.     SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

---

[4]     Specifically, Plaintiff asserted the following claims:  1) a negligence claim against
Robert Smith, Jr., the driver of the vehicle that collided with Plaintiff (Count I); 2) a negligence
*per se* claim against Robert Smith, Jr. (Count II); 3) a negligent entrustment claim against Robert
Smith, Sr., the father of Robert Smith, Jr. (Count III); 4) a negligence claim against Luigi
DiSpigno, the driver of the car in which Plaintiff was a passenger (Count IV); 5) a negligent
entrustment claim against Joseph Cerrone, the father of Luigi DiSpigno (Count V); 6) a
negligence claim against Ridley Township and John Does 1-10, as officers of the Ridley
Township Police Department (Count VI); and 7) a due process claim pursuant to 42 U.S.C. §
1983 against Ridley Township (Count VII).  (Compl. ¶¶ 44-87.)
        Defendants Robert Smith, Jr., Robert Smith, Sr., Luigi DiSpigno, and Joseph Cerrone
subsequently settled with Plaintiff, and were dismissed from this action pursuant to stipulation.
(Stipulation and Order of Dismissals, ECF Nos. 61, 62, 64.)

[5]     Count VI of the Amended Complaint also requests punitive damages.  (Am. Compl. ¶ 86.)
In Plaintiff's Response to the motion for summary judgment, Plaintiff consented to the dismissal of
the claim for punitive damages.  (Pl.'s Mem. 25.)

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    DISCUSSION

Plaintiff alleges a federal constitutional claim pursuant to 42 U.S.C. § 1983 under *Monell*

9

*v. New York City Department of Social Services*, 436 U.S. 658 (1978).  Plaintiff also alleges state law negligence claims under the Pennsylvania Political Subdivision Torts Claim Act, 42 Pa. Cons. Stat. § 8541.

### A.      Section 1983 Claim Against Ridley Township

Plaintiff's *Monell* claim alleges that Ridley Township:  1) had an inadequate policy governing police pursuits; 2) failed to properly train its police officers on police pursuits; and 3) failed to properly supervise its police officers during such pursuits.  (Pl.'s Mem. 9.)  Plaintiff relies heavily on the report of his expert Dr. Geoffrey P. Alpert to establish the areas where Ridley Township's policy, training and supervision were allegedly deficient.  Plaintiff also alleges that Ridley's inadequate policy and its failure to train and supervise its police officers were the actual and proximate cause of Plaintiff's injuries, or at the very least, there are genuine issues of material fact making summary judgment inappropriate.[6]

#### 1.      Policy or Custom

Plaintiff first alleges that the Ridley Pursuit Policy was deficient and inadequate, and as a result of its inadequacy, he was injured during the police pursuit on April 29, 2009.  Under *Monell*, Ridley Township may not be held liable under §1983 for the acts of its police officers

---

[6]      Ridley Township argues, as it did in its motion to dismiss the Amended Complaint, that because Plaintiff has not asserted an underlying constitutional violation by the individual police officers, Ridley Township may not face liability.  (Defs.' Mem. 9.)  We addressed and rejected this argument in our October 19, 2010 Order dismissing Ridley Township's Motion to Dismiss. (ECF No. 34) (explaining that despite criticism from other circuits, *Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994), *reh'g granted on other grounds*, *Fagan v. City of Vineland*, 22 F.3d 1296 (3d Cir. 1994) (*en banc*), which holds that "a municipality may be held independently liable for violating a plaintiff's constitutional rights, even if no individual police officer is liable," *id*. at 1297, is still the law of the Third Circuit, and we are therefore bound by it.).)

since "[t]here is no respondeat superior theory of municipal liability." *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) (citing *Monell*, 436 U.S. at 691). Rather, Ridley Township may only be liable for constitutional deprivations allegedly suffered by Plaintiff if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214-15 (3d Cir. 2001) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). Thus, when a suit against a municipality is based on § 1983, "the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. at 690). The municipal policy or custom must be the "moving force" behind the constitutional violation such that there is a direct link between the municipal policy or custom and the deprivation of constitutional rights. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiff does not contend that the Ridley Pursuit Policy is facially unconstitutional. Nor can Plaintiff establish, based upon the record, that Ridley Township has maintained a policy or custom of allowing or condoning improper or unconstitutional police pursuits. Rather, Plaintiff argues that Ridley Township implemented a police pursuit policy that was "seriously deficient" in that it does not give any guidance to police officers or supervisors regarding when pursuits are appropriate, when they should be terminated, or how police officers and supervisors are to communicate with each other during pursuits. (Pl.'s Mem. 15.) We note, however, that the Ridley Pursuit Policy does provide guidance to Ridley Township police officers with respect to the notification and communication with dispatch officers when initiating a pursuit, the use of emergency sirens during a pursuit, and when terminating a pursuit is appropriate. (*Id.*) The Ridley Pursuit Policy also provides that the "Commanding Officer on shift will evaluate and may terminate a pursuit at their discretion." (*Id.* at 59.) With respect to terminating a pursuit, the Policy provides that "[a]ll pursuits shall be terminated when the violation leading to the pursuit is of such a minor nature as to make a high risk of pursuit unreasonable." (*Id.*)

11

In support of his argument that the Ridley Pursuit Policy is inadequate, Plaintiff contends

that the policy does not comport with the guidelines contained in 75 Pa. Cons. Stat. § 6342. This Pennsylvania statute requires police departments in the Commonwealth to establish guidelines governing the procedures under which officers should initiate, continue, or terminate a motor vehicle pursuit, and provides specific guidelines for police departments to follow when crafting such policies. *Id.* However, even if the Ridley Pursuit Policy does not comply with the statutory guidelines set forth in § 6342, that noncompliance would not give rise to a § 1983 violation.

*McMullen v. Maple Shade Twp.*, 643 F.3d 96, 99 (3d Cir. 2011) ("[B]y its terms, § 1983 provides a remedy for violations of federal, not state or local law."); *see also Carter v. Bartle*, No. 89 8921, 1990 U.S. Dist. LEXIS 8777, at *3 (E.D. Pa. July 11, 1990) ("However, assuming *arguendo* that the arrest was not proper under Pennsylvania law, the 'violation of a state statute does not give rise to a corresponding § 1983 violation unless the right encompassed in the state statute is guaranteed under the United States Constitution.'") (quoting *Moore v. Marketplace Restaurant*, 754 F.2d 1336, 1349 (7th Cir. 1985)).

In any event, we are satisfied that the Ridley Pursuit Policy substantially complies with the requirements of 75 Pa. Cons. Stat. § 6342. The statute requires that police pursuit policies include guidelines addressing the following:

> (1) Decision making criteria or principles for initiation of pursuit. These criteria or principles may include, but not be limited to:
>> (i) The potential for harm or immediate or potential danger to others if the fleeing individual or individuals escape.

12

   (ii) The seriousness of the offense committed or believed to have been committed by the individual or individuals attempting to flee.

   (iii) Safety factors that pose a risk to police officers, other motorists, pedestrians and other persons.

(2) Responsibilities of the pursuing officers.

(3) Responsibilities for the communications center.

(4) Responsibilities of the field supervisor.

(5) Traffic regulations during pursuit, including, but not limited to, the use of emergency equipment, audio signals and visual signals.

(6) Pursuit tactics.

(7) Roadblock usage. (8)Communicationandcoordinationofpursuitprotocol forinterjurisdictional pursuit.

(9) Decision making criteria or principles for termination of pursuit. These criteria or principles may include, but not be limited to, safety factors that pose a risk to police officers, other motorists, pedestrians and other persons.

75 Pa. Cons. Stat. § 6342(c).

  With respect to the requirement that pursuit policies contain "decision making criteria for the termination of pursuits," the Ridley Pursuit Policy provides that "all pursuits shall be terminated when the violation leading to the pursuit is of such a minor nature as to make a high risk of a pursuit unreasonable." (Defs.' Mem. Ex. M. at 58.) With regard to the requirement that pursuit policies address responsibilities of pursuing officers, the Ridley Pursuit Policy provides that officers must notify police radio when initiating a pursuit, state "emergency pursuit" and provide information about the vehicle and the route taken. (*Id.*) The Policy further provides that only the pursuing officer shall use a siren, and that if the police vehicle in pursuit has lost visible contact with the fleeing vehicle, the officer shall notify radio dispatch, discontinue use of the siren and reduce speed. (*Id.*) With respect to the statutory requirement that pursuit policies address responsibilities of the field supervisor, the Ridley Pursuit Policy states that the "Commanding Officer on shift will evaluate and may terminate a pursuit at their discretion." (*Id.*) Moreover, the Ridley Pursuit Policy addresses pursuit tactics. Specifically, the Policy

contains guidance about the use of sirens by the initiating police vehicle, the discontinued use of sirens when the fleeing vehicle is no longer in sight, the communication with radio dispatch during the pursuit, and the termination of the pursuit. (*Id.*)  Finally, the Ridley Pursuit Policy specifically forbids the use of police vehicles as road blocks. (*Id.*)

In order to state a claim under § 1983, Plaintiff must demonstrate that his constitutional rights were violated as a result of the allegedly "deficient" pursuit policy. This the Plaintiff has not done. In particular, Plaintiff has failed to present any evidence that the Ridley Pursuit Policy was the "moving force" behind his injuries. *See Bryan Cnty.*, 520 U.S. at 404. Plaintiff points to no facts that establish proximate causation. Plaintiff merely relies on the report of Dr. Alpert which alleges without support that "the poorly constructed policy, the lack of meaningful training, supervision and accountability and the failure to comply with reasonable standards are all proximate causes of the crash." (Pl.'s Mem. Ex. G at 13.)

The record contains nothing to suggest that had the Ridley Pursuit Policy included more specific guidance regarding the types of offenses warranting initiation of pursuit, circumstances warranting termination of the pursuit, or the types of information to be communicated during the pursuit, the accident would not have occurred. Dr. Alpert concedes that Scanlan and Bongiorno were justified in initiating the traffic stop of Smith. (*Id.* at 10.) According to Dr. Alpert, it is when Smith failed to stop, or at a minimum, when Smith began driving erratically that Bongiorno and Scanlan should have terminated the pursuit. (*Id.*) However, Smith testified that he had lost consciousness just after the officers initiated the pursuit and has no recollection of the events occurring from that point in time until he woke up in the hospital the next morning. (Smith Dep. 72:25-73:16.) This is not surprising considering the amount of alcohol in his system and the accident that he caused. Thus, assuming the Ridley Pursuit Policy had contained more specific guidelines, and assuming Bongiorno and Scanlan followed these guidelines, the

14

evidence suggests that terminating the pursuit of Smith would have made little if any difference.

Moreover, even if the Ridley Pursuit Policy had contained more specific guidance on the initiation and termination of pursuits, there is no evidence that the pursuit of Smith was unreasonable in any respect. The police officers knew that Smith was driving without a license. They had good reason to believe that he was intoxicated. He was not speeding, but his driving was erratic and he was disregarding traffic signals. Smith was without question a danger to the community. The police officers would have been derelict in their duty if they had simply stopped and let Smith continue on. Moreover, this pursuit was by no means a high speed pursuit. The speeds that the officers attained during the pursuit were below or just above the speed limit. This unfortunate accident was caused by a drunk driver, not by an inadequate or deficient pursuit policy.

2.      *Failure to Train and Supervise*

Plaintiff next argues that the training Ridley Township provided to its officers regarding police pursuits was "woefully inadequate and reflects Ridley's deliberate indifference to the rights of its citizens, and specifically Mr. Jewell." (Pl.'s Mem. 18.)  In the absence of an unconstitutional policy or custom, a § 1983 violation may still exist if the municipality failed to properly train its employees and officers. *City of Canton*, 489 U.S. at 388. A municipality's failure to adequately train its police officers can subject it to liability only where the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Brown*, 269 F.3d at 215 (quoting *City of Canton*, 489 U.S. at 388). Deliberate indifference can ordinarily be shown where the failure "has caused a pattern of violations." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). In the absence of such a pattern, the

burden on plaintiff is high.  *Id.*  Plaintiff must establish that the case at bar falls within the "narrow range of circumstances" in which "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).  The "failure to train may amount to deliberate indifference where the need for more or different training is so obvious, and inadequacy is likely to result in violation of constitutional rights."  *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *City of Canton*, 489 U.S. at 389).  In addition, plaintiff must show that the deliberate indifference was the "moving force" behind the violation of plaintiff's constitutional rights.  *City of Canton*, 489 U.S. at 389.

In support of his claim that Ridley Township provided inadequate training to its officers, Plaintiff points to the testimony of Bongiorno and Scanlan, who stated that they did not recall the specifics of training in the area of police pursuits.  Although Plaintiff is correct that Bongiorno and Scanlan do not recall the specifics of their training and that neither officers retained the written course materials, both officers testified that they did in fact receive training on police pursuits.  (Scanlan Dep. 11:5-12, 21:3-18; Bongiorno Dep. 24:1-25:19.)  All Ridley Township police officers complete their Act 120 state-mandated training prior to beginning their duties as an officer, and this mandatory training includes topics on police pursuits and police driving. (Howley Dep. 69:15-70:17; Scanlan Dep. 10-11.)

In addition to receiving the mandatory training, both officers testified that they were aware of the Ridley Pursuit Policy, which had been in place at the time of the accident. (Bongiorno Dep. 32:21-33:15, 46:3-21; Scanlan Dep. 27:2-13.)  Both officers testified that they understood the policy to be that pursuit of a vehicle refusing to stop was permitted so long as it does not present a danger.  (Bongiorno Dep. 45:22-46-19 (stating that the basic policy is that an

16

officer may "attempt to stop a vehicle . . . as long as it is not a danger to other people on the

street"); Scanlan Dep. 27:2-13 (describing the policy to be generally that you "pursue vehicles

until it becomes unsafe").)  We are not prepared to find that Ridley Township's training in the

area of police pursuits was so "woefully inadequate" that it should subject Ridley Township to

liability under § 1983.  However, even if we were to decide that Ridley Township did not

provide adequate training to its officers on police pursuits, Plaintiff's § 1983 failure-to-train

claim nonetheless fails for two critical reasons.

       First, Plaintiff has not alleged facts to support a finding that Ridley Township's alleged

inadequate training amounted to a "deliberate indifference" to the rights of those people with

whom the officers came into contact.  *Brown*, 269 F.3d at 215.  Ridley Township had a policy in

place addressing police pursuits that was updated and provided to all of its police officers.

(Defs.' Mem. Ex. M. at 58; Howley Dep. 40:10-18, 41:3-9; Bongiorno Dep. 34:1-20.)  Plaintiff

has not pointed to any evidence suggesting that prior to April 29, 2009, Ridley Township was

ever involved in a police pursuit where an accident occurred.  In fact, the pursuit of Smith was

the first Ridley Township-initiated police pursuit in 25 years.  (Howley Dep. 97:24-98:15, stating

that he does not recall a time when Ridley Township was the "lead car" in the pursuit since he

started with the Department in 1984.)  The facts, therefore, do not support a finding that Ridley

Township committed a pattern of constitutional violations or that the need for more or different

training was so obvious as to amount to a deliberate indifference on the part of the Township.

*See Brown*, 269 F.3d at 216 (affirming grant of summary judgment to township on § 1983 claim

where police officers did not receive formal training but had the guidance of the policy manual

and where

plaintiffs failed to present evidence that "the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights."); *Labar v. Alercia*, No. 09-4182, 2011 WL 710478, at *2 (E.D. Pa. Feb. 28, 2011) (dismissing *Monell* claim against township for failure to train police officers on high speed pursuits where township had a policy in place and where allegations failed to "establish the lack of training was obvious . . . or likely to result in a constitutional violation").

Second, Plaintiff's argument suffers from the same flaws discussed above in that he has failed to show that the lack of adequate training on police pursuits was the "moving force" behind his injuries.  Neither Plaintiff nor his expert has identified what different training Ridley Township should have provided to its officers that might have prevented the accident.  Plaintiff therefore falls short of establishing a § 1983 violation based on a failure to train.  *See Reitz v. Cnty. of Bucks*, 125 F.3d 139, 144 (3d Cir. 1997) (affirming summary judgment where plaintiffs failed to identify the specific training the county should have offered which would have prevented the constitutional deprivation and "presented no evidence that similar conduct has occurred in the past").

### 3.    Failure to Supervise

Finally, Plaintiff asserts a failure to supervise claim against Ridley Township as a basis for his alleged § 1983 deprivation.  A municipality may be liable under § 1983 when its failure to supervise police officers represents a deliberate indifference to a plaintiff's constitutional rights. *Langweiler v. Borough of Newtown*, No. 10-3210, 2011 U.S. Dist. LEXIS 51410, at *14 (E.D. Pa. May 12, 2011) (citing *Christopher v. Nestlerode*, 240 F. App'x 481, 489 n.5 (3d Cir. 2007)). Plaintiff supports this claim with one allegation:  that Bongiorno was not a "detached supervisor"

18

because during the pursuit of Smith, he acted as both the supervisor, in charge of decision-making on the streets, as well as a participant in the pursuit.  (Pl.'s Mem. 21-22.) Bongiorno's conduct on this evening does not establish deliberate indifference.  Again, Plaintiff has not satisfied his burden in establishing a § 1983 violation.

### B. State Law Negligence Claim

Plaintiff also asserts a negligence claim against Bongiorno, Scanlan, and Ridley Township based on the allegation that Bongiorno and Scanlan, while acting within the scope of their employment, were negligent in the manner in which they pursued Smith.  Specifically, Plaintiff contends that the officers' pursuit of Smith was negligent in that it occurred "at night, at speeds well exceeding the speed limit, through residential neighborhoods, and in disregard of stop signs and traffic signals."  (Pl.'s Mem. 24.)

The Pennsylvania Political Subdivision Torts Claim Act, 42 Pa. Cons. Stat. § 8541, provides that, except for certain exceptions, local agencies are not liable "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof."  One exception exists for damages caused by the "negligent acts of the local agency or an employee thereof acting within the scope of his office or duties" and with respect to the "operation of a vehicle in possession or control of the local agency."  42 Pa. Cons. Stat. §§ 8542(a)(2) and (b)(1).  Pennsylvania law makes clear that the exceptions to governmental immunity under this statute are to be narrowly construed.  *Lockwood v. City of Pittsburgh*, 751 A.2d 1136, 1140 (Pa. 2000).

In order to establish a claim for negligence under Pennsylvania law, a plaintiff must prove the following four elements:  1) a duty or obligation recognized by law; 2) a failure to

19

conform to the standard required; 3) a causal connection between the conduct and the resulting

injury; and 4) damages. *Morena v. S. Hills Health Sys.*, 462 A.2d 680, 684 (Pa. 1983).

Proximate causation is established by a showing that a parties' alleged negligence was a

"substantial factor" causing plaintiff's harm.[7]Jones v. Chieffo, 700 A.2d 417, 420 (Pa. 1997).

Although the question of proximate causation is generally left for the jury, "if the relevant facts

are not in dispute and the remoteness of the causal connection between the defendant's

negligence and the plaintiff's injury clearly appears, the question becomes one of law." *Liney v.*

*Chestnut Motors, Inc.*, 218 A.2d 336, 338 (Pa. 1966); *Holman v. Central Parking Sys.*, No. 3

2011 Phila Ct. Com. Pl. LEXIS 75, at *3

(Pa. Com. Pl.  March 21, 2011).

      The only evidence Plaintiff directs us to in support of his negligence claim is the testimony

of Bongiorno and Scanlan, where the officers state that the pursuit took place on residential

streets, that Smith was driving at speeds ranging from approximately 20 to 35 mph, and that

neither Smith nor the officers stopped at the stop signs.  (Pl.'s Mem. 24; Bongiorno Dep. 103:3

---

[7]

      We recognize that the drafters of the Pennsylvania Suggested Standard Civil Jury Instructions for negligence actions recommend a shift away from the traditional "substantial factor" analysis in favor of a standard that is based simply on factual cause.  *See* Pa. SSJI (Civ.) 13.160 (Factual Cause), subcommittee note (explaining that the "substantial factor test" has caused confusion among jurors and recommending that the emphasis instead be on factual cause).  However, many Pennsylvania courts continue to use the "substantial factor" test in dealing with causation.  *See, e.g.*, *Summers v. Certainteed Corp.*, 997 A.3d 1152, 1165 (Pa. 2010) (applying substantial factor causation in asbestos case); *Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 205 (Pa. Super. Ct. 2008) (holding that plaintiff failed to establish in complaint that defendant's conduct was a substantial factor in causing her emotional distress).  More importantly, Plaintiff has cited with approval the substantial factor test in his Response to summary judgment (Pl.'s Mem. 24), and relies on cases that employ such test.  *See Jones*, 700 A.2d at 420; *Aiken v. Bor. of Blawnox*, 747 A.2d 1282, 1284-85 (Pa. Commw. Ct. 2000).

105:1, 106:10-24, 109:14-22, 111:2-112:4; Scanlan Dep. 50:16-58:2.)  The fact that the pursuit

occurred at night and in residential neighborhoods does not in this instance support a finding that

the officers were negligent because as both Stine and Dr. Alpert point out, there were no other

cars or pedestrians on the road during the course of the pursuit.  (Pl.'s Mem. Ex. G at 3 & Ex. H

at 8.)

        Similarly, the fact that the officers did not obey stop signs or may have at times been

traveling above the speed limit does not necessarily mean that the officers breached a duty of

care to Plaintiff.  Pennsylvania police officers are granted certain privileges "when responding to

an emergency call or when in the pursuit of an actual or suspected violator of the law."  75 Pa.

Cons. Stat. § 3105(a).  Such privileges allow police officers to:  "[p]roceed past red signals or

stop signs, but only after slowing down as may be necessary for safe operation"; "[e]xceed the

maximum speed limits so long as the driver does not endanger life or property"; and "[d]isregard

regulations governing direction of movement, overtaking vehicles or turning in specified

directions."  *Id.* at § 3105(b)(2)-(4).  A police officer may only take advantage of these privileges

when "using audible and visual signals."  *Id.* at § 3105(c).  These privileges, however, do not

relieve the police officer "from the duty to drive with due regard for the safety of all persons." *Id.*

at § 3105(e); *see also Roadman v. Bellone*, 108 A.2d 754, 757 (Pa. 1954) (noting that the

privilege to disregard certain traffic rules does not mean that the officer or the municipality may

be excused for damages caused by the officer's driving in "reckless disregard" of the safety of

others).

        Here, Bongiorno activated the emergency sirens and lights on his vehicle during the

pursuit of Smith.  (Bongiorno Dep. 107:1-4; Scanlan Dep. 46:21-47:4.)  Moreover, the record

contains no evidence that the police officers were in fact exceeding the maximum speed limits

during the pursuit.  Traveling at speeds of 15-20 mph to 30-35 mph, together with the fact that

there were no other vehicles or pedestrians on the road, does not suggest that the officers acted

without due regard for the safety of others.  Moreover, although Scanlan and Bongiorno did not

obey stop signs, they were privileged to do so by 75 Pa. Cons. Stat. § 3105(b)(2).  Based on the

evidence, we do not believe that it can reasonably be argued that Bongiorno and Scanlan pursued

Smith without due regard for the safety of others.

Finally, Plaintiff has failed to point to any evidence, including any from Dr. Alpert, that

Bongiorno and Scanlan's conduct during the pursuit was the proximate cause of the accident.  In

order to establish proximate causation, Plaintiff would need to show that the officers' conduct

was a substantial factor in causing his injuries.  *Jones*, 700 A.2d at 417.  Plaintiff relies on *Jones*

for the proposition that a jury should decide whether a third parties' conduct, like the police

officers' in this case, was a substantial factor in causing his injuries.  *Jones*, however, is factually

distinguishable.  In *Jones*, plaintiff was struck by a vehicle being chased during a police pursuit.

*Id.* at 418.  The cars were traveling at approximately 70-80 mph during the pursuit and the police

officer's emergency siren did not work and was therefore not activated.  *Id.*  The parties

stipulated that "if the police car had a working siren, [plaintiff] would have heard it and avoided

the accident."  *Id.*  Moreover, a police department directive required that officers in pursuit have

their emergency lights and sirens activated at all times.  *Id.*  Based on these facts, the court in

*Jones* was not prepared to hold as a matter of law that the police officer's alleged negligence in

pursuing a vehicle without activated emergency sirens in violation of police department directive

was not a substantial factor in causing plaintiff's injuries.  *Id.* at 420.

In this case, unlike *Jones*, the emergency lights and sirens were activated.  There is no

evidence suggesting that had Bongiorno or Scanlan's pursuit of Smith been any different, the

accident would not have occurred.  In fact, as mentioned above, Smith testified that he became

unconscious after the moment he noticed the emergency lights.  Thus, he could not have been

aware of the officers actions during the course of the pursuit.  In any event, there are no facts

here that suggest that Bongiorno and Scanlan's conduct was a substantial factor in causing the

accident.  Because the causal connection is too remote, the issue of proximate causation is not

appropriate for a jury and rather becomes a question of law.  *Liney*, 218 A.2d at 338.  Moreover,

based on this record, we are satisfied that Bongiorno and Scanlan did not breach any duty owed

to Plaintiff.[8] See Marcelle v. City of Allentown, No. 07-4376, 2010 U.S. Dist. LEXIS 31649, at

*3738 (E.D. Pa. Mar. 31, 2010) (granting summary judgment to police officer on a state law

negligence count where his conduct during the pursuit complied with 75 Pa. Cons. Stat. § 3105

and the record lacked evidence establishing proximate causation).

We are not unsympathetic to the tragic injuries suffered by Plaintiff.  However, when

viewing the record in a light most favorable to him, and drawing all inferences in his favor, we

cannot conclude as a matter of law that a reasonable juror would find Ridley Township or its

police officers liable, either in tort or under the Constitution, for the unfortunate accident that

occurred on April 29, 2009.

---

[8]

Plaintiff also asserts a negligence claim against Ridley Township based on respondeat
superior, alleging that the officers were at all relevant times acting within the scope of their
employment.  (Am. Compl. ¶¶ 81-88.)  Since we find as a matter of law that Bongiorno and
Scanlan were not negligent, we will also enter summary judgment in favor of Ridley Township
on the negligence count.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted on all Counts.

**BY THE COURT:**

_____
_     **R. BARCLAY**
**SURRICK, J.**